[Crim. No. 10153.   In Bank.   Jan. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH LYLE STONER, Defendant and Respondent.

Robert L. Kern, under appointment by the Supreme Court, for Defendant and Respondent.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David S. Sperber, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant's conviction of robbery in the first degree (Pen. Code, §§ 211, 211a) was reversed by the United States Supreme Court on the ground that illegally seized evidence was admitted at his trial. (*Stoner* v. *California*, 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889].) Upon re-trial, defendant was again convicted of robbery in the first degree. He appeals from the judgment.

At 8 p.m. on October 25, 1960, two men, one with a gun, entered the Budget Town Market in Monrovia and ordered David Greeley, a clerk at the checkout counter, to put the money from the cash register in a paper bag. They forced Greeley and another clerk to lie on the floor and then left. When the police arrived, Greeley told them that the man with the gun was wearing a gray sweater or jacket, gray pants, a gray shirt, a gray work hat, and horn-rimmed glasses, and was holding a gray .45 caliber automatic.

The day after the robbery, a person who lived next door to

the Budget Town Market found a checkbook in her yard, which she gave to the manager of the market, who in turn gave it to the police. Using the account number printed on the checks, the investigating officers obtained defendant's name and discovered that he had previously been convicted of murder and robbery. They showed a photograph of defendant to the clerks at the store and received a tentative identification of him as the man who had held the gun. The officers then went to the Mayfair Hotel where they believed defendant was staying. When the night clerk told them that defendant must be out because his room key was in his mailbox, the officers explained that they were trying to find defendant to arrest him on suspicion of robbery and asked permission to enter his room. The clerk took the officers to the room, unlocked the door and admitted them. The officers searched the room and found a pair of horn-rimmed glasses, several gray sweaters and jackets, and a gray .45 caliber automatic.

On Saturday, October 29, defendant was arrested in Las Vegas and waived extradition. Although the investigating officers from Monrovia arrived in Las Vegas on Saturday night, they did not begin the return trip immediately because they wished to determine whether defendant's confederate was also in town. On Monday, October 31, the officers brought defendant to California. At his request, they stopped in Pomona so that he might talk to his parole officer. They then took him to the Temple City jail where he spent the night. On Tuesday morning defendant appeared in a showup and was told to put on the glasses, a sweater that had been taken from his room, and a hat. Greeley identified him at this time as the robber who had held the gun. Later that morning the investigating officers interrogated defendant and obtained an oral confession. Shortly after noon he was brought before a magistrate and arraigned.

At defendant's first trial, the various items taken from his hotel room were introduced into evidence. The Supreme Court of the United States reversed the judgment of conviction, holding that these items were inadmissible on the ground that the police had violated the Fourth and Fourteenth Amendments of the United States Constitution when they searched defendant's room. At defendant's second trial, the prosecution did not introduce any of the items that the police found in defendant's hotel room. It relied primarily on defendant's oral confession and Greeley's courtroom identification. Defendant took the stand and denied that he had committed the robbery. His

former sister-in-law testified that defendant was at her house at 8 p.m. on the night of October 25, 1960.

Defendant contends that the trial court erred in admitting the confession into evidence on the ground that it is a product of the illegal search and seizure and was therefore "a fruit of the poisonous tree." (*Nardone* v. *United States*, 308 U.S. 338, 341 [84 L.Ed. 307, 60 S.Ct. 266]; see *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 391-392 [64 L.Ed. 319, 40 S.Ct. 182, 24 A.L.R. 1426].)

In *Wong Sun* v. *United States*, 371 U.S. 471, 475 [9 L.Ed.2d 441, 83 S.Ct. 407], the United States Supreme Court considered statements of a defendant made after the police had unlawfully entered his home and illegally arrested him. It held that once the "verbal evidence . . . derives so immediately" from the misconduct, it must be excluded. This court has excluded extrajudicial statements of the victim of an illegal search and seizure when it appeared that the statements were induced or impelled by the unlawful acts. (*People* v. *Bilderbach*, 62 Cal.2d 757, 768 [44 Cal.Rptr. 313, 401 P.2d 921]; see *People* v. *Dixon*, 46 Cal.2d 456, 458 [296 P.2d 557]; *People* v. *Macias*, 180 Cal.App.2d 193, 197-198 [4 Cal.Rptr. 256].) In other jurisdictions extrajudicial statements are excluded when they are "the product" of (*People* v. *Rodriguez*, 11 N.Y.2d 279, 286 [183 N.E.2d 651, 653, 229 N.Y.S.2d 353, 357]) or "obtained under the compulsion of the things seized" (*Takahashi* v. *United States* (9th Cir.) 143 F.2d 118, 122; see *Commonwealth* v. *Spofford*, 343 Mass. 703, 707-708 [180 N.E.2d 673, 676]; *People* v. *Bilderbach, supra*, at pp. 767-768; Broeder, *Wong Sun* v. *United States: A Study in Faith and Hope* (1963) 42 Neb.L.Rev. 483, 548).

Although there is conflicting testimony as to the details of what occurred between the time of defendant's arrest and his confession, the uncontradicted facts (see *People* v. *Trout*, 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve*, 51 Cal.2d 286, 290 [332 P.2d 97]) compel exclusion of the confession as a fruit of the illegal search and seizure. Officer Collins, one of the investigating officers from Monrovia, testified that when he and his partner arrived in Las Vegas, they told defendant that he was suspected of robbing the Budget Town Market and that his room at the Mayfair Hotel had been entered. The officer recalled that they told defendant their reasons for accusing him of the crime but he could not remember whether they had specifically informed defendant that a gun, eyeglasses, and clothing sim-

ilar to those seen by witnesses to the robbery had been taken from defendant's room and that he had been tentatively identified as one of the robbers from his photograph. It was "possible" that they "might have" mentioned all these details to their prisoner. Either in Las Vegas or on the trip back to Monrovia, defendant told the officers that he wished to talk to his parole officer in Pomona. The officers called ahead to make an appointment. Defendant and his parole officer met in the Pomona jail on Monday afternoon and discussed the possibility that defendant's parole would be revoked because a gun had been found in his room. Upon leaving the jail, the parole officer told the investigating officers that defendant should have time to think since he was considering whether or not to make various admissions.

Sometime on Monday, defendant requested permission to telephone his wife. According to defendant, the officers told him that he could not telephone anyone and especially not his wife. When he repeated his request, they told him that he could talk with his relatives after he confessed. Officer Collins testified that he told defendant that he preferred that defendant not telephone his wife since she might alert his confederate in the crime and that at no time did he forbid defendant from making a telephone call although he certainly wished to keep him out of contact with the outside world so that defendant could think about making a confession. On Monday night, defendant's wife telephoned the police station. An officer told her that the Temple City jail had no facilities for visiting with the prisoners and that she could talk to her husband at the arraignment on the following day.

On Tuesday morning, at an interrogation that followed the showup, defendant confessed to having participated in the robbery. He testified that before he confessed the officers showed him his gun and glasses and told him that if he confessed no charges would be pressed and he would be returned to prison only for violating the conditions of his parole. Officer Collins testified that no promises were made and that defendant was shown the gun and glasses only after he admitted robbing the Budget Town Market. Defendant was told, however, that the police had taken a gun from his room.

It appears that from the time defendant was arrested in Las Vegas until he confessed, the investigating officers used the items they had illegally seized to induce him to confess. In Las Vegas, he was told that his room in the Mayfair Hotel had been searched. He learned from the investigating

officers that incriminating evidence had been found there. By the time he had talked with his parole officer, he knew that the police had his gun. At the showup, if not before, he discovered that his glasses and sweater had been seized. From the time that he was arrested in Las Vegas until the time he was arraigned, he talked with none of his relatives and received no legal advice.[1] During this 72-hour period, defendant saw only police officers, his parole officer, and perhaps some other prisoners. Finally, the record does not show that defendant was informed, at any time before he confessed, that he had a right to remain silent.

Under these circumstances there was no break in the chain between the illegal search and seizure and defendant's confession. It was not "sufficiently an act of free will to purge the primary taint." (*Wong Sun* v. *United States, supra,* at p. 486; see *Fahy* v. *Connecticut,* 375 U.S. 85, 90-91 [11 L.Ed.2d 171, 84 S.Ct. 229].)

Since the confession was inadmissible under the rule of *Wong Sun* v. *United States, supra,* 371 U.S. 471, 475, as fruit of the poisonous tree, we need not consider defendant's contentions that it was involuntary and also inadmissible under *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Although the judgment must be reversed because of the error in admitting defendant's confession, he raises a subsidiary issue that may arise on retrial.

Defendant contends that Greeley's courtroom identification must also be excluded as a fruit of the poisonous tree on the ground that Greeley was able to identify him at the showup only because he wore the illegally seized clothing and could not have identified him at the trial had he not identified him at the showup.

Before Greeley identified defendant at the trial, the court conducted a hearing outside the presence of the jury to determine whether Greeley's courtroom identification would be dependent upon his identification at the showup. Greeley stated that on the night of the robbery defendant stood at the checkout counter for approximately five minutes and spoke several times. When Greeley compared his perceptions from watch-

---

[1]Officer Collins testified that in Las Vegas defendant asked for an attorney. When the officer asked who defendant's attorney was and how he might be reached, defendant changed his mind and said that he wished to talk to his parole officer. Defendant testified that he could not remember whether or not he asked for an attorney but that he was quite sure the officers never offered to call one for him.

ing and listening to defendant in this and other courtroom appearances with his recollections of the night of the robbery, he was sure defendant was one of the robbers. ''I mean you don't forget a person you are facing right on, whether having glasses on or a hat, or whatever they do have on, and his demeanor. He is quiet. He doesn't seem excitable and he is the same way he talked through—all the time. I think I would recognize him right off any time.'' Again, when asked what made his remembrance so clear, Greeley replied, ''probably more his demeanor than anything because he is quite calm, and when I talked to him, as I say, I think I recognized his voice as the same soft and controlled voice.'' The trial court ruled that the witness' courtroom identification would be sufficiently independent of his showup identification to be admissible.

Defendant contends that regardless of how honestly and strongly an eyewitness to a crime may believe that his courtroom identification is not affected by an earlier tainted showup identification, it should be held as a matter of law that once a witness has made a tainted identification of the accused, he must be disqualified from ever making a subsequent courtroom identification, for he cannot clear his mind of earlier impressions. No cases have carried the fruit-of-the-poisonous-tree doctrine this far.[2]

▆▆ The federal courts have held that an eyewitness who has made an identification of the accused while the latter was being unlawfully detained following a lawful arrest is not precluded from making a subsequent independent courtroom identification. (See, e.g., *Jacobson* v. *United States* (8th Cir.) 356 F.

---

[2]In a recent federal case, a majority of the court held that a courtroom identification was tainted by a previous view of the defendant by the witness in an illegal showup and therefore should not have been allowed. (*Wade* v. *United States* (5th Cir.) 358 F.2d 557, cert. granted 385 U.S. 811 [17 L.Ed.2d 53, 87 S.Ct. 81].) It did not hold, however, that a tainted identification forecloses any later identification freed of the taint, but carefully considered all the surrounding circumstances and concluded that in the particular situation the courtroom identification was irremediably tainted by the earlier illegal showup. In two other federal cases, dissenting judges arrived at the same conclusion on the facts before them but stated that the pivotal problem is the actual effect of the tainted identification on the courtroom identification. (*Gilbert* v. *United States* (9th Cir.) 366 F.2d 923, 951, dissenting opinion of Browning, J.; *United States* ex rel. *Stovall* v. *Denno* (2d Cir.) 355 F.2d 731, 742, dissenting opinion of Friendly, Waterman and Smith, JJ., cert. granted 384 U.S. 1000 [16 L.Ed.2d 1014, 86 S.Ct. 1983].) In *Gilbert*, Judge Browning based his dissent on the fact that the trial judge did not make the necessary factual determination. The majority rejected the idea that a witness could ever be tainted. In *Denno*, the dissenting judges found prejudice because the jury was told about the tainted identification.

2d 685; *Edwards* v. *United States* (D.C. Cir.) 330 F.2d 849.) As the Court of Appeals for the District of Columbia recently noted: "The consequence of accepting appellant's contention in the present situation would be that . . . [the witness] would be forever precluded from testifying against . . . [the defendant] in court, merely because he had complied with the request of the police that he come to police headquarters and had there identified . . . [the defendant] as the robber. Such a result is unthinkable. . . . The rights of the accused in a case like the present are adequately protected when the complaining witness takes the stand in open court, for examination and cross-examination." (*Payne* v. *United States,* 294 F.2d 723, 727, cert. den. 368 U.S. 883 [7 L.Ed.2d 83, 82 S.Ct. 131].) In *Monroe* v. *United States* (D.C. Cir.) 234 F.2d 49 [98 App. D.C. 228], cert. den. 352 U.S. 873 [1 L.Ed.2d 76, 77 S.Ct. 94], it was held that the recipient of a telephone call could testify as to what he had heard although in the interim he had listened to an inadmissible tape recording of the same conversation. In *Warren* v. *Territory of Hawaii,* 119 F.2d 936, the Court of Appeals for the Ninth Circuit permitted witnesses to testify on the basis of independent recollections even though their testimony reiterated statements they had previously made to the police when confronted with evidence that the court assumed had been illegally seized.

Thus, the fruit-of-the-poisonous-tree doctrine has not been invoked when the alleged fruit is testimony of a witness to a crime whose identity was not learned through police misconduct. (See *Payne* v. *United States, supra,* at p. 727.) Although it may be impossible for a person to forget a significant perception and to prevent stored remembrances from subconsciously affecting his later perceptions and decisions (see Bartlett, Remembering (1961) pp. 186-214; Cameron, Remembering (1947) p. 78; 5 Freud, Collected Papers (Strachey ed., 1950) pp. 175-180), it does not follow that the testimony of a person in Greeley's position should be excluded. ▮▮ [See fn. 3.] Even if Greeley's courtroom identification was dependent in part on his viewing defendant in illegally obtained clothing at the showup, it was " 'sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States, supra,* at p. 488, quoting J. Maguire, Evidence of Guilt (1959) p. 221.)[3]

---

[3] In considering the admissibility of Greeley's courtroom identification, we have assumed that the trial court correctly excluded Greeley's showup identification on the ground that it was tainted by the use of defendant's illegally seized glasses and clothing. The showup identification would be

Since other questions raised are not likely to arise on retrial, we need not consider them here.

The judgment is reversed.

McComb, J., Peters, J., Tobriner, J., Burke, J., Sullivan, J., and Roth, J. pro tem.,* concurred.

admissible despite the use of those items, however, if the prosecution proved that the identification was not affected thereby; that in any event defendant would have been observed under virtually identical conditions. (See, e.g., *Wayne* v. *United States* (D.C. Cir.) 318 F.2d 205, 209 [115 App.D.C. 234], cert. den. 375 U.S. 860 [11 L.Ed.2d 86, 84 S.Ct. 125]; *Somer* v. *United States* (2d Cir.) 138 F.2d 790, 792; *Parts Mfg. Corp.* v. *Lynch* (2d Cir.) 129 F.2d 841, 842-843 [143 A.L.R. 132]; R. Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule* (1964) 55 J.Crim.L., C. & P.S. 307, 315.) Thus, the prosecution could establish the admissibility of the showup identification if it could prove that whenever a victim described the culprit's clothing, the Monrovia police had all persons in the showup wear similar clothing and would have had defendant appear in glasses and clothing substantially the same as his own illegally obtained glasses and clothing had the latter not been available.

*Assigned by the Chairman of the Judicial Council.