[Crim. No. 14298. Second Dist., Div. Three. Apr. 25, 1969.]

THE PEOPLE, Plaintiff and Appellant, v. REX RAMSEY, JR., et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Donald J. Kaplan, Deputy District Attorneys, for Plaintiff and Appellant.

Richard T. Sykes for Defendants and Respondents.

COBEY, J.—This is an appeal by the People from the granting of a motion made by defendants, pursuant to Penal Code section 995, to dismiss seven charges against them. These charges included one count of grand theft auto (Pen. Code, § 487, subd. 3), three counts of receiving stolen property (Pen. Code, § 496) and two counts of conspiracy (Pen. Code, § 182) against all defendants and one count of receiving stolen property against defendant Harbert only. These charges were dismissed by the trial court on the ground that all the evidence in the case was derived from a police officer's unconstitutional search of premises where the first of the stolen cars was found. We affirm.

On appeal, the People contend that this search was not unconstitutional. Additionally they argue that once the validity of the search is established, (1) there was probable cause to arrest defendants Harbert, Shoop, Harris and McKie; (2) the search and seizure conducted within Unit 4, one of the places where a stolen car was found, was lawful; and (3) sufficient competent evidence was presented at the preliminary examination to support the information as to all counts except count III.[1]

---

[1] As to count III, one of the charges of receiving stolen property, the People concede that the car involved was obtained as the result of an illegal search and seizure within Unit 17, one of the locations involved, so that there is no evidence to connect any of defendants to count III.

## The Facts

On October 12, 1966, on arriving for work at about 6 a.m., the manager of a catering service at 7955 Haskell in Van Nuys found the premises full of smoke, which apparently was coming from the adjacent unit, Unit 12-A. The catering service was located in one unit of an industrial complex composed of units facing a central courtyard area. The manager opened the smaller of the two doors to 12-A by taking it off its hinges and saw smoke inside. He called the fire department. A unit of the Los Angeles Fire Department, led by Capt. Frank Reischl, responded to his call.

The firemen entered 12-A by the door which the catering service manager had opened. On the floor of 12-A they found a smouldering rag. They put out the fire, ascertained that there was no further fire hazard, and left after putting the door back on its hinges.[2]

While in 12-A Reischl noticed that it contained a maroon Mustang automobile and a white Mustang. The white Mustang had apparently been cut in half with an acetylene torch and its accessories, seats, and engine had been removed. Its fenders and grille were stacked against a wall and there was an engine on a hoist. The place did not look to Reischl like an automobile shop, as the only tools he could see were a cutting torch and a set of mechanic's socket wrenches, and there were no drip pans. With the exception of the smouldering rag on the floor, the premises were clean and neatly swept.

After returning to the fire station, Reischl telephoned the Van Nuys police station and reported his observations to the officer at the desk.

James Nelson, a Los Angeles police officer, arrived at the scene of the fire between 7:30 and 7:45 a.m. He had received a call from a field sergeant over his car radio some 15 minutes earlier, telling him to go to Unit 12-A at 7955 Haskell, "contact the fireman and stand by for the detectives and check any serial numbers or license numbers for possible stolen vehicles." On arrival he smelled smoke but did not see any firemen. Using a drive running along one side of Unit 12-A, he walked around the building looking for the firemen. He

---

[2]Reischl testified initially that when he left he closed the door and assumed that it was locked, but on cross-examination he stated that the door was shut so that the interior was not visible, but that it was probably not locked. The catering service manager testified that he helped the firemen put the door back on its hinges, but that it was left unlocked and ajar about two inches.

found the door to Unit 12-A open approximately 12 to 18 inches. He opened the door wider and from the doorway, without going into the unit, put his head inside to look for the firemen.

From this vantage point Nelson saw no firemen. The interior of the unit looked to him like a body shop or an auto repair shop. He saw that it contained a white 1965 Mustang, with all its parts removed, and a red 1967 Mustang from which the hood and, apparently, the air conditioner or radiator had been removed. He could see a temporary paper license plate on the red car, but could not read the number. After walking around the building again, he returned to his radio car and called the police station. He asked whether there was supposed to be a fireman on the scene and requested further instructions. He was told that no new instructions had been received.

He then came back to the unit and entered to check the cars for license and serial numbers. He was able to determine the motor number and temporary license plate number of the red car, but the serial number of the white car appeared to have been burned off. He went to his car again and called in the numbers of the red Mustang to the police station. A check revealed that this car had been stolen. Nelson then waited until two detectives arrived. He informed them of the stolen car inside the unit and left the scene.

Sgt. Kenneth Wheeler, one of the two detectives, entered Unit 12-A, verified the fact that the 1967 Mustang described by Nelson was a stolen car, and locked the door to Unit 12-A. Thereafter, beginning at about 8:30 a.m., Wheeler initiated a stake-out of Unit 12-A.

Shortly after midnight the following morning defendant Harbert arrived at Unit 12-A and let himself in apparently by unlocking the door which had been open earlier. He was arrested after he failed twice to respond to Officer Wheeler's knocking on the door of Unit 12-A and his subsequent attempt to run away from the policemen. After being advised of his constitutional rights, which he appeared to understand, he stated that his name was Don Harbert and that he had walked to that location from downtown Los Angeles. A check of the area for a vehicle which he might have used resulted in the finding of defendant Shoop seated in a parked car about a block away. Shoop agreed to come with the police to Unit 12-A. There he identified Harbert as the person with whom he had driven from Los Angeles. Shoop was then arrested. A search of the persons of Harbert and Shoop revealed that both

carried keys which fitted the padlocks of both Units 12-A and 17.

Meanwhile, acting on information received from the tenant of Unit 11 that several individuals had been going back and forth between Units 12-A and 17 and the discovery that both units had padlocks of the same type and brand, the police had also initiated a stake-out of Unit 17. This stake-out had begun at about noon the previous day. It resulted in the arrest that afternoon of defendants McKie and Harris, who had come out of Unit 17 carrying auto parts whose ownership they were unwilling or unable to explain to the arresting officers. On the following day, these officers entered Units 12-A and 17 to make an inventory of their contents. The People concede that this entry and search of Unit 17, which was carried out without a search warrant or the consent of either McKie and Harris, was unconstitutional.

Further police investigation revealed that the owner of the premises at 7955 Haskell had rented Unit 12-A to defendant Ramsey and Unit 17 to defendant Harris. Another unit, Unit 4, was rented to a Mr. Williamson who had given the owner the same phone number as Ramsey's. A search warrant was obtained for Unit 4, and a search of Unit 4 pursuant to this warrant resulted in the discovery of an orange 1965 Corvette.

The 1967 red or maroon Mustang found in Unit 12-A, the 1962 red or maroon Corvette in which Shoop was found, a dark green Jaguar XKE found in Unit 17, and the Corvette discovered in Unit 4, were all identified as stolen vehicles.

### THE INITIAL UNCONSTITUTIONAL SEARCH AND ITS EFFECT

A threshold question is whether the protection of the Fourth Amendment to the United States Constitution, and its counterpart in the California Constitution, article I, section 19, both of which guarantee the right of people to be secure in their "persons, houses, papers, and effects, against unreasonable" searches and seizures, extends to Unit 12-A, the first garage entered by the police. The People argue that Unit 12-A is a "garage," neither attached nor immediately adjacent to any residential structure, and as such is not entitled to the constitutional protection afforded to "houses." In support of this proposition, they cite several California cases upholding the admissibility of evidence obtained from searches of garages or other structures not immediately attached to residences. (See *People* v. *Shields,* 232 Cal.App.2d 716 [43 Cal.

Rptr. 188]; *People* v. *Alexander,* 253 Cal.App.2d 691 [61 Cal.Rptr. 814]; *People* v. *Lees,* 257 Cal.App.2d 363 [64 Cal. Rptr. 888]; *People* v. *Murray,* 270 Cal.App.2d 201 [75 Cal. Rptr. 625]; *People* v. *Muriel,* 268 Cal.App.2d 477 [74 Cal. Rptr. 44].)

The applicable holdings of these cases are apparently based upon the ancient common law distinction between the curtilage, the area immediately surrounding the house and habitually used for family purposes, and open fields. (See *Hester* v. *United States,* 265 U.S. 57, 59 [68 L.Ed. 898, 900, 44 S.Ct. 445].) There would appear to be some doubt as to whether this territorial concept of the curtilage, which originally referred to the land and buildings within the shelter of a baron's stone walls, has substantial relevance to the housing conditions of modern life. (See LaFave, *Search and Seizure : The Course of True Law . . . Has Not . . . Run Smooth* (1966) U. Ill. L.F. 255, 338-340.) In any event, however, as *People* v. *Alexander, supra,* 253 Cal.App.2d 691 made clear, the basic rationale of these cases is not a mechanical application of the curtilage concept, but instead the following rationale stated in *People* v. *Willard,* 238 · Cal.App.2d 292, 307 [47 Cal.Rptr. 734], and adopted in *People* v. *Alexander* : ''. . . [T]he degree of privacy which defendant enjoyed in the place involved is an important factor in determining the reasonableness of the search; and . . . essentially the determination of its reasonableness must depend upon the facts and circumstances of the particular case.'' (See *People* v. *Alexander, supra,* at pp. 699-700.)

Thus, the most important consideration is not the precise geographical location of the particular place involved, but instead the degree of privacy which the individual should reasonably expect to enjoy there. (See *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].) According to *Katz,* the basic question in determining whether a search is reasonable is not whether ''a given 'area,' viewed in the abstract, is 'constitutionally protected.' . . . [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.] ''(*Katz, supra,* 389 U.S. at pp. 351-352 [19 L.Ed. 2d at p. 582]; see also Note, *From Private Places to Personal Privacy : A Post-Katz Study of Fourth Amendment Protec-*

*tion* (1968) 43 N.Y.U. L.Rev. 968, 976-977.) Stated otherwise, the crucial question is "whether the area is one in which there was a reasonable expectation of freedom from governmental intrusion." (See *Mancusi* v. *De Forte*, 392 U.S. 364, 368 [20 L.Ed.2d 1154, 1159, 88 S.Ct. 2120].)

 However, it is not necessary for us to determine whether Unit 12-A, viewed simply as a garage, was constitutionally protected against unreasonable searches and seizures. This is because Unit 12-A was entitled to this protection by virtue of its character as commercial premises. There appears to be no doubt that the protection of the Fourth Amendment extends generally to commercial premises when they are not open to the public. (See *Mancusi* v. *De Forte*, *supra*, 392 U.S. at p. 367 [20 L.Ed.2d at pp. 1158-1159]; *See* v. *Seattle*, 387 U.S. 541, 543 [18 L.Ed.2d 943, 946, 87 S.Ct. 1737].) In *See*, which involved a conviction for refusing to permit a representative of a city fire department to enter and inspect the defendant's locked commercial warehouse without a warrant and without probable cause to believe that a violation of any municipal ordinance existed therein, the United States Supreme Court stated that "[T]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." (*See, supra,* 387 U.S. at p. 543 [18 L.Ed.2d at p. 946].)

In the present case the owner of the property at 7955 Haskell testified that he was in the industrial rental business, and that the property was "M-2 property, industrial."[3] Other than the catering service in the unit immediately adjacent to Unit 12-A, the record does not indicate the exact nature of the commercial enterprises located on the property. However, the record does show that the overall appearance of the complex would suggest to anyone coming upon it that it was being used for commercial purposes of one sort or another. It was composed of a number of small units, also described as "shops," facing on a central courtyard area. Each shop had two doors, a large garage type door and a smaller door.

As for Unit 12-A, there was apparently no reason for Officer Nelson, on his arrival at the garage, to assume that it was anything other than a commercial establishment. Officer Nelson testified that after unsuccessfully looking around the area for the firemen he had been ordered to contact there, he pushed

---

[3]The designation "M-2" indicates a "light industrial zone." (City of Los Angeles Zoning Code (1967) § 12.19, pp. 72-73.)

open the door of Unit 12-A, which was already open from 12 to 18 inches, and put his head inside to look for the firemen. From this position, he saw what looked to him like "a body shop or an auto repair shop," containing two cars in disrepair. One of these had a temporary paper license plate which he could not read. He apparently saw nothing which indicated to him that the shop was being used for other than a commercial purpose. It should be noted, furthermore, that Nelson, by his own testimony, did not know at the time of his entry the substance of the fire captain's report that Unit 12-A, when examined from the interior, did not in fact look like an automobile repair shop. Nelson had been told via the police radio only to go to the location, contact the firemen there, check the license plates of any cars and wait for detectives.[4]

But, as already indicated, the constitutional protection at issue does not apply to commercial property when it is open to the public. (See, e.g., *People* v. *Davis,* 205 Cal.App.2d 517, 520 [23 Cal.Rptr. 152].) *See* v. *Seattle, supra,* 387 U.S. at p. 543 [18 L.Ed.2d at p. 946] involved a *locked* commercial warehouse. In the present case Unit 12-A was not locked when Officer Nelson arrived since it had been left unlocked by the firemen. However, defendants had apparently left Unit 12-A locked; otherwise the catering service manager would not have had to gain entry by taking one of its doors off its hinges.

Furthermore, there was nothing to indicate to a person coming onto the property that Unit 12-A was actually open to the public as an auto repair shop at that particular time. Officer Nelson arrived at about 7:45 a.m., relatively early in the morning, and was able to ascertain by simply putting his head in the door that there were no firemen and apparently no other persons on the premises.

The several searches by Nelson and other police officers, subsequent to Nelson's entry, of course, revealed that Unit 12-A was not in fact being used for a legitimate business enterprise. ■ It is settled, however, that a search cannot be justified by what it turns up. (See *People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528].)

■ Notwithstanding the foregoing conclusion that Unit 12-A was a constitutionally protected place, the People argue

---

[4]According to Nelson's initial testimony, the catering service manager met him on his arrival at the location and told him of the fire, the arrival of the firemen, and the fact that there were two Mustangs inside Unit 12-A, including one that was all cut up. Nelson subsequently testified, however, that he did not see the catering service manager until after he had been in the building.

that since the apparent emergency of the fire justified the entry of the firemen into Unit 12-A, Officer Nelson was likewise justified in entering even though he arrived after they had departed. The People's position is that if Nelson had arrived while the firemen were still there, he could have entered at their invitation, and that there is no reason why the result should be different because he arrived after their departure and in fact entered without such an invitation.

It should first be noted that Officer Nelson did not enter in order to look for the firemen. On first arriving, he saw no signs of the presence of firemen, and he verified that there were none in the area by walking around the building twice— once before looking into Unit 12-A and once thereafter. By looking into Unit 12-A he satisfied himself that there were none inside.

The People are correct in their contention that the firemen themselves were clearly justified in entering pursuant to the apparent emergency. Once inside, the fire captain was under no obligation to blind himself to the suspicious conditions which he properly reported to the police. (See *People* v. *Roberts*, 47 Cal.2d 374, 377, 379 [303 P.2d 721].) Had Officer Nelson's arrival occurred while the firemen were still on the scene, he could have entered at their invitation and searched the premises if his entry and search bore some reasonable relation to the purpose for which the firemen entered, namely, to deal with the emergency presented by the fire. (See *People* v. *Roberts, supra*, at pp. 378-379; *Romero* v. *Superior Court*, 266 Cal.App.2d 714, 722 [72 Cal.Rptr. 430].)

However, by the time Officer Nelson arrived, this emergency had clearly ceased to exist. Nelson smelled smoke, but no firemen were on the scene, and his look inside the unit should have convinced him, had he been in any doubt, that then there was no fire. The People's claim that Nelson's entry was lawful because of the firemen's prior lawful response to an emergency situation which had terminated is untenable.

Nor can Officer Nelson's search of Unit 12-A be justified on the ground that he had reasonable or probable cause— based on information received through official police channels and on his own observations through the partially open door —to believe that Unit 12-A might contain stolen vehicles. The law is settled that probable cause to believe that an article sought is concealed within constitutionally protected premises does not provide justification for a warrantless search of such premises. (See *Chapman* v. *United States*, 365

U.S. 610, 613 [5 L.Ed.2d 828, 831, 81 S.Ct. 776]; *People* v. *Henry*, 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Marshall*, 69 Cal.2d 51, 57, fn. 2 [69 Cal.Rptr. 585, 442 P.2d 665].) ■ In California probable or reasonable cause provides a statutory basis for a peace officer making a lawful arrest for a felony (see Pen. Code, § 836, subd. 3); it does not, however, generally provide a lawful basis for a constitutional warrantless search.[5]

■ Having determined the unconstitutionality of Officer Nelson's entry and search, we must now decide whether this primary illegality tainted all the subsequently discovered evidence against defendants, so as to compel the dismissal of the charges against them by reason of the "fruit of the poisonous tree" doctrine.

■ This doctrine, originated by the United States Supreme Court some 50 years ago, compels the exclusion not only of illegally obtained evidence, but of any further evidence derived from such illegally obtained evidence. (*Silverthorne Lbr. Co.* v. *United States,* 251 U.S. 385, 391, 392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426]; *Nardone* v. *United States,* 308 U.S. 338, 339-341 [84 L.Ed. 307, 310-311, 60 S.Ct. 266]; *Wong Sun* v. *United States,* 371 U.S. 471, 484-485 [9 L.Ed.2d 441, 453-454, 83 S.Ct. 407].) There are two limitations on the application of the doctrine. First, evidence ultimately derived from illegally obtained evidence is nevertheless admissible if its connection with the illegally obtained evidence "has become so attenuated as to dissipate the taint." (*Nardone* v. *United States, supra,* 308 U.S. at p. 341 [84 L.Ed. at p. 312].) Secondly, such evidence is also admissible, despite the primary illegality, if it can be shown that it had a source independent of this illegality. (*Silverthorne Lbr. Co.* v. *United States, supra,* 251 U.S. at p. 392 [64 L.Ed. at p. 321].)

---

[5]But with respect to automobiles, it has been held that a search without a warrant may be justified by probable cause to believe that the automobile contains articles subject by law to seizure. This is because it is not always practicable to obtain a warrant for the immediate search of a vehicle which can be moved from the locality readily and quickly. (See *Carroll* v. *United States,* 267 U.S. 132, 149-150 [69 L.Ed. 543, 549-550, 45 S.Ct. 280, 39 A.L.R. 790]; *People* v. *Burke,* 61 Cal.2d 575, 579 [39 Cal.Rptr. 531, 394 P.2d 67].)

This exception is not applicable to this case, however, since it is not Nelson's search of either of the automobiles which is at issue. It is rather his warrantless entry into the building for the purpose of searching it and his accomplishment of this purpose.

Nor is this a case in which a warrantless search was justified by a "grave emergency." (See *McDonald* v. *United States,* 335 U.S. 451, 455 [93 L.Ed. 153, 158, 69 S.Ct. 191].)

Neither of these limitations is applicable to the present case. The sequence of events already detailed shows clearly that Officer Nelson's discovery that Unit 12-A contained a stolen automobile triggered the subsequent police investigation which led ultimately to the arrest of all the defendants. This subsequent investigation included: (1) the verification by Detective Wheeler of Nelson's discovery; (2) the lengthy stake-out of Unit 12-A, starting at 8:30 a.m., and leading to the arrest of Harbert and Shoop between midnight and 1 a.m.; (3) the discovery of the connection between Units 12-A and 17, and the stake-out of Unit 17, leading to the arrest of Harris and McKie; (4) the discovery of Ramsey's connection with Units 12-A and 4; and (5) the obtaining of a search warrant for, and the search of, Unit 4. Although this investigation was quite elaborate and entailed considerable expenditure of police manpower, it did not involve any independent intervening act which either broke the causative chain, or dissipated the taint of the original illegality. (See *People* v. *Johnson,* 70 Cal.2d 541, 549 [75 Cal.Rptr. 401, 450 P.2d 865].)

Nor is there any indication of an independent source for the evidence which was obtained as a result of the police investigation following Officer Nelson's discovery. The fire captain's report was the sole source of information regarding Unit 12-A which the police had, aside from Officer Nelson's discovery when the investigation was initiated. The fire captain's report indicated that the interior of Unit 12-A looked suspicious to him but it did not contain the specific information that a stolen vehicle was there.

The independent source limitation upon the fruit of the poisonous tree doctrine normally applies when the evidence derived from the unlawful conduct of the police would have been ultimately revealed by usual and commonplace police investigative procedures. (See *People* v. *Ditson,* 57 Cal. 2d 415, 433-444 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Stoner,* 65 Cal.2d 595, 602-603, fn. 3 [55 Cal.Rptr. 897, 422 P.2d 585]; Pitler, *The Fruit of the Poisonous Tree Revisited and Shepardized* (1968) 56 Cal.L.Rev. 579, 627-630; Maguire, *How to Unpoison the Fruit, the Fourth Amendment and the Exclusionary Rule* (1964) 55 J. Crim. L., C. & P.S. 307, 313-317.) This ''inevitable discovery exception'' has been criticized as being in sharp conflict with the fundamental purpose of the exclusionary rule. This fundamental purpose, the deterrence of unconstitutional police conduct in the obtaining of

evidence, requires that the courts focus on the actualities of the conduct involved and not on the possibility or even probability that the evidence might have been turned up in some other manner. (See Pitler, *supra*, at p. 630.)

In any event, the inevitable discovery exception is inapplicable to the present case. To establish this exception it must be established that the proffered evidence would have been obtained by constitutional means even if the unconstitutional act had not taken place. Thus, in *People* v. *Stoner*, in which the defendant was identified by an eyewitness at a showup at which the defendant was garbed in his own illegally seized glasses and clothing, the California Supreme Court stated that ''the prosecution could establish the admissibility of the showup identification if it could prove that whenever a victim described the culprit's clothing, the Monrovia police had all persons in the showup wear similar clothing and would have had defendant appear in glasses and clothing substantially the same as his own illegally obtained glasses and clothing had the latter not been available.'' (*Stoner, supra* at p. 603, fn. 3.) No showing has been made that the elaborate police investigation in this case would have been undertaken solely on the basis of the fire captain's report and without the information disclosed by Nelson's entry.

The California cases applying this exception, which we have been able to discover, each involved a situation in which at the time of the unconstitutional police action a police investigation into the offense had already been initiated and it could, therefore, be assumed that the investigation would have uncovered evidence implicating the defendant independently of the subsequent unconstitutional police action. (See *People* v. *Chapman*, 261 Cal.App.2d 149, 166-169 [67 Cal. Rptr. 601]; *People* v. *Thomsen*, 239 Cal.App.2d 84, 91 [48 Cal.Rptr. 455].) In the present case, no police investigation at all had taken place at the time of Nelson's entry.

As stated earlier, Nelson's illegal discovery really triggered the subsequent elaborate and effective police investigation. We cannot say that this investigation would have occurred if it had not been for Nelson's discovery of a stolen car in Unit 12-A. This discovery was the foundation rock; without it the structure would not have been built.

We regret that one comparatively inexperienced policeman's mistake in following the instructions given him at the outset of a police investigation has undermined and destroyed the extremely fine job of detection and apprehension

of a car-theft ring which the police did here. But the purpose of the exclusionary rule of deterring the use by the police of unconstitutional means of investigation and apprehension of suspected criminals would not be served by ignoring in this case the unconstitutionality of their initial search and the legal consequences thereof.

The order granting defendants' motion to dismiss the charges against them is affirmed.

Ford, P. J., and Moss, J., concurred.

A petition for a rehearing was denied May 14, 1969, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1969. McComb, J., was of the opinion that the petition should be granted.