Filed 3/24/16  P. v. Holzworth CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY SCOTT HOLZWORTH,<br><br>       Defendant and Appellant. | A142440<br><br>(Sonoma County<br>Super. Ct. No. SCR-627215) |

Defendant Jeffrey Holzworth was charged with grand theft and receiving stolen property after evidence obtained pursuant to three search warrants indicated he was stealing money from parking machines that he was responsible for emptying as part of his duties as a police officer with the Santa Rosa Junior College Police Department.  After the trial court denied his motion to quash the third of the three search warrants, defendant pleaded guilty to all charges against him and was sentenced to four years in state prison.

Defendant's appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, in which he requested that we independently review the record to determine whether there existed any arguable issues that required briefing.  After conducting our independent review, we ordered supplemental briefing on the issue of whether the third warrant was "supported by probable cause in light of the court's order granting [defendant's] motion to quash search warrant nos. 12-629 and 12-630 based on its finding that the 2006 search of [defendant's] bag and 2012 search of his vehicle's center console were illegal searches."

1

The parties submitted the requested briefing. Defendant argues that the probable cause statement in support of the third warrant should have been stricken in its entirety, the warrant quashed, and the evidence suppressed. The Attorney General argues that the trial court's ruling was correct. We agree with the Attorney General, and we affirm.

## FACTUAL BACKGROUND

### Search Warrant Nos. 12-630 (Warrant No. 1) and 12-629 (Warrant No. 2)

In November 2012, defendant, a longtime officer with the Santa Rosa Junior College (SRJC) Police Department, came to the attention of the Santa Rosa Police Department when SRJC Police Chief Matthew McCaffrey reported a suspicion that defendant was stealing money from SRJC parking permit machines and meters. On November 13, Santa Rosa Police Detective Mark Azzouni sought search warrants authorizing the installation of GPS tracking devices on defendant's personal pickup truck and patrol car (warrant no. 1) and the acquisition of a credit report for defendant (warrant no. 2). In the statements of probable cause in support of the warrants, Azzouni attested to the following:

On November 1, 2012, Azzouni and another officer met with Chief McCaffrey, who informed them that defendant was the only SRJC police department employee with access to the 33 parking permit machines on the main campus and was solely responsible for removing money from the machines at the public safety training center in Windsor. A majority of the money put into the machines was quarters and $1 and $5 bills, and each machine could contain several thousand dollars at a time. Defendant collected the money from the machines and submitted it to the accounting department at SRJC. Each machine ran independently, and there was no way to determine if defendant turned in all the money he collected. Defendant was equipped with the only computer capable of clearing out the accounting memory from the machines, and he kept the computer with him or locked in his office. SRJC employees often saw defendant using the computer to clear out a machine's memory after he removed the money. McCaffrey speculated that defendant was collecting money from multiple machines in one day but only submitting funds from some of the machines. He requested that the Santa Rosa Police Department

2

conduct a criminal investigation to determine if defendant was in fact stealing from SRJC.

On November 10, Azzouni spoke with SRJC Police Sergeant Steven Potter.[1] Potter related that on the morning of October 24, he and defendant left the SRJC Police Department to attend a departmental training session. Defendant offered to give Potter a ride in his pickup truck. After Potter got into the truck, defendant realized he forgot his cell phone so he walked back into the police department. As Potter was sitting in the truck waiting for defendant, he noticed that the cup holders were filled with nothing but quarters. This reminded him that the console tray of defendant's patrol car was often full of change. Out of curiosity, Potter opened the center console of the pickup truck and saw six stacks of dollar bills, each approximately one inch thick. Each stack contained approximately 100 bills, and at least one stack had a $5 bill on top. Defendant returned to the pickup truck and had a look of " 'panic' " on his face. He opened the center control only wide enough to slide his wallet into it. Once in the training session, defendant kept his car keys in his pocket, while the other participants stored their keys in a general location.

Potter told Azzouni he had personally observed defendant removing money from the machines while defendant was on his personal time and driving his pickup truck. Potter recalled one particular incident two or three years earlier when, at about 4:30 a.m. on a Sunday, he saw defendant, clad in sweatpants and a sweatshirt, emptying coins from a parking meter. Potter stopped to speak to defendant, who told him he was leaving for Las Vegas later that day and needed to empty the machines prior to leaving. Because it was Sunday, the accounting office was not open.

Potter also described an incident that occurred in 2006. Potter and another officer were in the SRJC Police Department locker room when they noticed defendant's work bag, which he usually kept in his locker or his private office, sitting out in the open. Potter knew the bag contained the tools defendant used to maintain the parking machines.

---

[1] Potter, who was the first to suspect defendant of theft, had authored a memorandum outlining his suspicions that McCaffrey gave to Azzouni.

3

The bag was partially unzipped, and Potter and the other officer opened it further and saw a large amount of loose $1 bills totaling $100 to $200, as well as quarters.

Potter described defendant's daily routine while he was on duty: he started his shift at 5:30 a.m., emptied machines until about 7:00 a.m., and went to a café where he also went for lunch. He went home at least once during each shift.

Potter was recently at the SRJC Petaluma campus, where he observed a community service officer remove approximately $1,700 from one of the parking machines. The machines generate a printout that should accompany the monies removed from the machine, but defendant can reset the machine's memory. The machines do not have any accounting mechanism to show how much should be in each machine prior to being emptied.

Based upon Azzouni's statements of probable cause, the court issued warrant no. 1 (authorizing the placement of a GPS tracking device on defendant's pickup truck and patrol car) and warrant no. 2 (authorizing the acquisition of a credit report). The GPS tracking devices were installed that day, and the credit report obtained the next day.

**Warrant 12-630(A) (Warrant No. 3)**

On November 27, 2012, Detective Azzouni sought a third search warrant, this one for defendant and his house, office, pickup truck, and patrol car. In the supporting statement of probable cause, Azzouni detailed surveillance Santa Rosa police officers had conducted of defendant over the preceding two weeks. He attested to the following information[2]:

On November 14, while on duty, defendant accessed several parking permit machines, including one on the SRJC Windsor campus. After leaving the Windsor campus, defendant drove directly to his house. He got out of his patrol car carrying two envelopes, went into his house, came back outside a few minutes later, and put an envelope in his mailbox.

---

[2] The statement of probable cause was initially sealed but was later unsealed on an unopposed motion of defendant.

4

On November 16, defendant was seen at several parking permit machines. A detective walked past his patrol car and saw a plastic bin containing five to seven cloth pouches. Defendant was later seen carrying the bin into the administration building. While he was still in the building, the detective again walked by defendant's patrol car and saw a blue canvas item rolled up on the back seat, suggesting that defendant had not turned all of the bags of cash into the accounting department.

That same day, defendant left work midday and drove home. He walked up to a gate on the left side of his house, removed a tan bag from his sweatshirt pocket, and dropped it near the gate. The bag disappeared shortly thereafter, and the only way it could have done so was for someone to have opened the gate from inside the house. It appeared that defendant dropped the item there to keep it from being discovered by other occupants of the house and that he had walked through the house, accessed the side gate, and retrieved the bag.

On November 17, defendant was seen accessing several parking permit machines during his shift. He was also seen throwing receipts from several parking permit machines away in a dumpster. The receipts were supposed to be submitted with a deposit bag to indicate how much money had been retrieved from a machine when it was emptied. Azzouni believed defendant took money from the machines and discarded the receipts to hide any evidence of how much money should have been deposited. A short time later, a detective looked inside defendant's patrol car and saw newspapers and a half-inch stack of dollar bills on the front passenger seat. Defendant was later seen carrying a rolled up newspaper from his patrol car to his pickup truck, driving home, and bringing the rolled up newspaper into his house.

On November 19, Azzouni examined the contents of defendant's garbage cans outside his house and found paperwork indicating that defendant was involved in gambling.

On November 21, defendant was observed accessing several parking permit machines and coin-operated parking meters while on duty. He was also seen removing a plastic bag with unknown contents from his patrol car and handing it to a bookstore

5

employee. Defendant later left work carrying a stack of newspapers and other paperwork, placed them on the front passenger seat of his pickup truck, and walked back inside the police department. He later left work, drove to the Redwood Credit Union, went inside, and came back out carrying a folded item under his arm.

On November 23, defendant was observed accessing several parking permit machines and coin-operated parking meters while on duty. While at the Windsor campus, he removed items from inside parking permit machines and connected a laptop computer to the machines. Azzouni believed he removed the money and then erased the machine's memory. Parking permit test receipts were found in garbage cans on the SRJC campus.

Later that same day, defendant drove into the SRJC rear parking area, transferred an Exchange Bank bag and other items from his patrol car to his pickup truck, and drove home. A little while later, the GPS tracking device issued an alert that defendant had left home and driven to the Community First Credit Union. He was seen leaving the credit union with a white item folded up in his hand.

On November 24, defendant arrived at work carrying what appeared to be the Exchange Bank bag. During his shift, he accessed several parking permit machines and coin-operated parking meters. At some point, a detective looked in defendant's patrol car and saw a folded newspaper on the passenger seat and a white cloth bank bag on the floorboard. Around 12:30 p.m., defendant drove home in his patrol car, walked inside the house with either a newspaper or a cloth bag, and left home empty-handed a half-hour later.

At about 3:30 p.m. that same day, defendant left the SRJC Police Department and got into to his patrol car. He drove from the outside parking area to a spot inside the back lot and, while sitting in the car, placed something on a newspaper and folded it. He then walked to his pickup truck and placed the newspaper inside his truck. He walked away from his truck empty-handed.

On November 26, Azzouni again examined the contents of the garbage cans outside defendant's house and found additional paperwork indicating defendant was

6

involved in gambling. He also found a receipt from Community First Credit Union (dated November 23) showing two $300 deposits and a $600 withdrawal, consistent with an exchange of bills.

Later that day, the GPS tracking device on defendant's pickup truck alerted that defendant had left his house. He was tracked to Redwood Credit Union. From there, he went to a shopping center and then to Walmart, where he was observed with "a large 'wad' of $5 bills."

That same day, a detective contacted the manager of the Community First Credit Union, who informed the detective that on November 23, as shown on the credit union's video surveillance, defendant had entered the credit union with a cloth bag that contained $300 in $1 bills and $300 in $5 bills, which he deposited into his personal account. He then withdrew $600. The manager told the detective that defendant conducted similar transactions on a regular basis and claimed he owned a vending machine business.

Also on November 26, a detective reviewed video surveillance from the Redwood Credit Union, which showed that at approximately 4:00 p.m. on November 21, defendant was at the teller window with a tan colored cloth bag and at least 10 rolls of quarters. He handed the teller at least four bundles of $1 bills. Video surveillance also showed that at approximately 9:00 a.m. on November 26, he was again at the teller window with 10 rolls of quarters, three stacks of $1 bills, and one stack of $5 bills.

Based on Azzouni's statement of probable cause, the court issued the search warrant. It was executed the following day, and the search recovered extensive evidence, including canvas bags containing thousands of dollars in coins and small bills, further indicating that defendant had been stealing from SRJC.[3] Defendant was arrested that day.

---

[3] As a result of items found during the searches authorized by warrant no. 3, Azzouni obtained three additional search warrants for defendant's bank records. Defendant does not challenge those warrants.

PROCEDURAL HISTORY

**The Charges Against Defendant**

On January 30, 2013, the District Attorney of the County of Sonoma filed a 12-count, felony complaint against defendant. Count 1 charged him with grand theft of a value exceeding $950, with a special allegation that a material element of the crime was fraud and embezzlement of more than $150,000. (Pen. Code, §§ 487, subd. (a), 186.11, subd. (a).) Counts 2 through 12 charged him with receiving and concealing stolen property. (Pen. Code, § 496, subd. (a)).[4] Defendant pleaded not guilty to the charges and denied the special allegation.

**Defendant's Motion to Quash the Search Warrants**

On July 17, 2103, prior to the calendaring of a preliminary hearing, defendant moved to "quash and/or traverse search warrants and to suppress evidence pursuant to Penal Code section 1538.5 & 1540." The motion argued that Potter's searches of defendant's work bag and pickup truck console were illegal searches in violation of the Fourth Amendment and that any evidence discovered as a result of those searches, including evidence obtained pursuant to warrant no. 3, was subject to suppression.

The People opposed defendant's motion, defendant filed a reply, and the People filed a response to defendant's reply.

**Hearing on Defendant's Motion to Quash**

Defendant's motion came on for hearing on November 21, 2013. Evidentiary hearings were held on January 15 and February 5, 2014. At the conclusion of the hearings, the court found that Potter's searches of defendant's bag and pickup truck console were illegal searches. It therefore excised those observations from the probable cause statements in support of warrant nos. 1 and 2 and then quashed those two warrants for lack of probable cause. Turning to the statement of probable cause in support of warrant no. 3, the court excised two and a half paragraphs that related information

---

[4] The complaint also charged defendant's wife with four felonies related to defendant's theft of monies from SRJC.

obtained as a result of the GPS tracking devices.[5]  Based on the remaining information and the totality of the circumstances, the court found the warrant supported by probable cause and denied defendant's motion to quash it.

### Defendant's Guilty Plea and Sentence

On April 2, 2014, pursuant to an open plea agreement with an indicated sentence of "4 year prison top," defendant pleaded guilty on all 12 counts and admitted the special allegation charged in count 1.

On May 29, defendant was sentenced to four years in state prison.

Defendant filed a timely notice of appeal.

### Defendant's *Wende* Brief and Supplemental Briefing

On March 25, 2015, defendant's appellate counsel filed a brief in accordance with *People v. Wende, supra,* 25 Cal.3d 436, in which he requested that we independently review the record to determine whether there existed any arguable issues that required briefing.  Counsel also informed defendant of his right to file a supplemental brief.

On April 13, defendant filed a supplemental brief in which he argued that because the trial court had found that Potter's search of his work bag and pickup truck were illegal searches, "all of the evidence should be tossed out.  The only reason the investigation began was based on the search of my vehicle.  The evidence obtained is considered fruits of the poisonous tree."  Defendant also advised that "It was brought to [his] attention that [his] lawyer should have filed another motion in regards to this issue but he failed to do so as he was unaware."

On May 5, we ordered briefing on whether warrant no. 3 was "supported by probable cause in light of the court's order granting [defendant's] motion to quash search

---

[5] Specifically, the half-paragraph stating that on November 23, a GPS alert indicated that defendant left his residence, which prompted the surveillance team to follow him to the Community First Credit Union, and the two paragraphs stating that on November 26, a GPS alert again indicated that defendant had left his house and driven to the Redwood Credit Union and that a conversation with the manager of the Community First Credit Union confirmed defendant's November 23 deposit of $600 in $1 and $5 bills.

warrant nos. 12-629 and 12-630 based on its finding that the 2006 search of [defendant's] bag and 2012 search of his vehicle's center console were illegal searches." The parties submitted the ordered briefing, and we now turn to the issue raised in our order.

## DISCUSSION

The issue raised by our *Wende* review is whether the probable cause statement in support of warrant no. 3 should have been stricken in its entirety because the surveillance described therein would not have occurred but for Potter's illegal searches (as defendant contends) or, alternatively, whether the trial court properly excised language pertaining to information derived from warrant nos. 1 and 2 and then found warrant no. 3 supported by probable cause based on the remaining information and the totality of the circumstances (as the Attorney General contends). Before turning to the merits of this issue, however, we note the Attorney General's argument that defendant did not preserve this Fourth Amendment claim for appellate review. This contention is based on the failure of defendant's trial counsel to renew the suppression motion in the superior court, as required by Penal Code section 1538.5, subdivision (m), and *People v. Lilienthal* (1978) 22 Cal.3d 891, 896. Defendant counters that renewal was not required in this case. We need not resolve whether the issue was preserved because even if it was, we conclude the trial court did not err in denying defendant's motion to quash warrant no. 3.[6]

"The Fourth Amendment, made applicable to the states through the Fourteenth Amendment's due process clause [citations], guarantees 'the people' '[t]he right . . . to be secure . . . against unreasonable searches and seizures . . . .' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 182–183.) Evidence seized during an unlawful search generally cannot be used as proof against the victim of that search. (*Weeks v. United States* (1914)

---

[6] Although defendant contends the Fourth Amendment issue is properly before us, he nevertheless filed a petition for a writ of habeas corpus, asserting that his trial counsel rendered ineffective assistance by failing to renew his suppression motion and failing to advise him before he entered his guilty pleas that the failure to renew his motion could forfeit appellate review of the trial court's order. (*In re Jeffrey Scott Holzworth on Habeas Corpus*, No. A146868.)
By separate order of today's date, we deny the petition.

10

232 U.S. 383.) The suppression of such wrongfully obtained evidence—a "judicially prescribed remedial measure" known as the exclusionary rule (*Segura v. United States* (1984) 468 U.S. 796, 804 (*Segura*)—"reaches not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks v. United States*, 232 U.S. 383 (1914), but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' *Nardone v. United States*, 308 U.S. 338, 341 (1939). It 'extends as well to the indirect as the direct products' of unconstitutional conduct. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) [(*Wong Sun*)]." (*Segura, supra,* at p. 804.)

The United States Supreme Court has held, however, that the determination of whether evidence recovered as a result of an illegal search must be suppressed as fruit of the poisonous tree is not governed by a "but for" analysis: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun, supra,* 371 U.S. at p. 487–488; see also 4 Witkin, Cal. Crim. Law (4th ed. 2012) Illegally Obtained Evidence, § 34, p. 776 ["The exclusionary rule extends to direct and indirect products of an unreasonable search, including physical objects, papers, and verbal statements. The test, however, is not a mechanical 'but for' rule."].)

As the California Supreme Court has explained it: "Rejecting a strict 'but for' test, the United States Supreme Court has admonished that in such cases, 'the more apt question . . . is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Citation.]' (*Wong Sun, supra,* 371 U.S. 471, 488.) 'Under *Wong Sun*, evidence is not to be excluded merely because it would not have been obtained but for the illegal police activity. [Citation.] The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become

attenuated so as to dissipate the taint. [Citation.]' (*People v. Caratti* (1980) 103 Cal.App.3d 847, 851.)" (*People v. Boyer* (2006) 38 Cal.4th 412, 448.)

One recognized situation in which derivative evidence has been "purged of the primary taint" is where " 'the challenged evidence has an independent source, [such that] exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' " (*Murray v. United States* (1988) 487 U.S. 533, 537 (*Murray*); see also *Segura, supra,* 468 U.S. 796 [under the independent source doctrine, an illegal entry on private premises by the police did not require suppression of evidence subsequently discovered by police at those premises while executing a valid search warrant based solely on information unconnected with and known before the initial entry]; *Silverthorne Lumber Co. v. United States* (1920) 251 U.S. 385, 392 [first recognizing the independent source rule].)

Another recognized exception to the fruit of the poisonous tree doctrine is the inevitable discovery exception. (*Murray, supra,* 487 U.S. at p. 539.) That exception applies where "the challenged evidence would have been eventually secured through legal means regardless of the improper official conduct . . . ." (*People v. Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 673; accord, *Nix v. Williams* (1984) 467 U.S. 431.)

In *Brown v. Illinois* (1975) 422 U.S. 590, 603–604, the court identified the following factors as bearing on whether the connection of derivative evidence to an unlawful search has become sufficiently attenuated to dissipate the taint: (1) the temporal proximity of the Fourth Amendment violation to the procurement of the evidence; (2) the presence of intervening circumstances; and (3) the flagrancy of the official misconduct. (Accord, *People v. Boyer, supra,* 38 Cal.4th at p. 448; *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1179.)

Against this background, we turn to defendant's argument that warrant no. 3 should have been quashed because the surveillance of him, the details of which constituted the probable cause for warrant no. 3, only occurred because of Potter's illegal searches of his work bag and pickup truck console. In the lingo of *Wong Sun*, he contends that warrant no. 3, and the evidence obtained pursuant thereto, was "come at by

exploitation" of the illegality of Potter's searches. (*Wong Sun, supra,* 371 U.S. at p. 488.) The standard by which we review this claim is well established: " 'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' " (*People v. Johnson* (1993) 6 Cal.4th 1, 25; accord, *People v. Carter* (2005) 36 Cal.4th 1114, 1140; *People v. Williams* (1988) 45 Cal.3d 1268, 1301.) Applying that standard here, we are compelled to disagree with defendant.

Fundamental to our analysis, and relevant to the factors identified in *Brown v. Illinois, supra,* 422 U.S. at pp. 603–604, is the involvement here of two different law enforcement agencies. Potter was a sergeant with the SRJC Police Department when he looked inside defendant's work bag in 2006 and the console of defendant's pickup truck in 2012. Thus, the searches that the trial court found to be illegal were conducted by the SRJC Police Department. But that police department was not the law enforcement agency that conducted the surveillance of defendant that provided the probable cause for warrant no. 3. Rather, the Santa Rosa Police Department was solely responsible for conducting the investigation. There was thus a "break in the chain between the illegal search" (*People v. Stoner* (1967) 65 Cal.2d 595, 600) and the surveillance that formed the basis for Azzouni's probable cause statement. As such, we conclude that the surveillance of defendant was not obtained by exploitation of Potter's searches of defendant's work bag and car console. Or, as the Supreme Court put it in *Nardone v. United States, supra,* 308 U.S. at 341, the connection between Potter's illegal searches and the surveillance of defendant was "so attenuated as to dissipate the taint." The trial court therefore properly excised only the language in the probable cause statement for warrant no. 3 that derived from warrant nos. 1 and 2, but left the remainder of the statement untouched.

This outcome is consistent with the purpose of the exclusionary rule, which is to deter illegal police conduct. (*United States v. Calandra* (1974) 414 U.S. 338, 347–348 [primary purpose of the exclusionary rule "is to deter future unlawful police conduct and

13

thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."]; *United States v . Lopez-Martinez* (9th Cir. 1984) 725 F.2d 471, 476 ["If application of the rule in a particular situation 'does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.' "]; *People v. Beuer* (2000) 77 Cal.App.4th 1433, 1437 ["The exclusionary rule serves to deter police from violating the Fourth Amendment to the United States Constitution."].)  Here, punishing the Santa Rosa Police Department, which engaged in no illegal conduct, for unlawful searches conducted by another law enforcement agency before the Santa Rosa Police Department was even involved would serve no deterrent purpose.

## DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


A142440; *P. v. Holzworth*

15