[Civ. No. 33550.    Second Dist., Div. Four.    Oct. 22, 1968.]

ROBERT REIGN ROMERO, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

Charles V. Weedman for Petitioner.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Donald J. Kaplan, Deputy District Attorneys, for Real Party in Interest.

WAPNER, J. pro tem.*—Policemen who were called by firemen to the scene of a fire in a residential unit of an apartment building seized, among other things, a quantity of dynamite, numerous machine gun parts (later assembled into four machine guns), an automatic pistol equipped with a silencer, and a document described as an "application for rental." Petitioner was subsequently charged with six criminal offenses, as follows: possession of a machine gun in violation of Penal Code, section 12220 (four counts); possession of a silencer for firearms in violation of Penal Code, section 12520 (one count); and reckless and malicious possession of dynamite in an inhabited dwelling in violation of Health and

*Assigned by the Chairman of the Judicial Council.

Safety Code, section 12304, subdivision (a) (one count). By timely petition for prohibition, as provided in Penal Code, section 1538.5, subdivision (1), he seeks to overturn an order of the superior court denying his motion to suppress evidence.

The evidence as adduced from the transcript of the preliminary hearing reveals the following: About May 1, 1968, the resident manager of an 8-unit, two-storied apartment building in Sherman Oaks, rented the apartment next to her own to petitioner, giving him a rental application which he signed in her presence. The "application for rental" (Exhibit 6) was identical to the one she gave him and she recognized his signature on it. On July 15, 1968, about 8:30 a.m., she heard two loud "bangs," saw the common wall between the apartments vibrate. Plates which were hanging on the wall were knocked off; then the kitchen windows of petitioner's apartment blew out, and she saw smoke and flames coming from the petitioner's kitchen windows.

A fireman, aide to the battalion chief in charge of fighting the fire in the apartment arrived on the scene at 8:50 a.m. and entered the apartment as soon as other firemen had "knocked down" the fire sufficiently to enter. It was his duty to search for possible victims. Wearing a self-contained air mask, he passed through the burning and burned-out front portions of the apartment through a hall and bedroom. He opened a sliding door of a wardrobe-type closet in the bedroom and saw in plain sight therein quantities of what appeared to be dynamite, machine gun parts, and ammunition. With the dynamite was a coil of fuse. The fuse is depicted in one of the photographs. The fireman immediately informed the battalion chief who entered and looked at the articles in the closet. The chief immediately ordered the fireman to radio for the fire protection bureau, the arson bureau, and police assistance. The fireman called for the "bomb squad" which was a "police function."

After making the calls the fireman then had a conversation with the apartment manager who was standing nearby. She advised him of the "explosions" she had heard. He returned to the apartment and assisted other firemen in "overhauling" the fire. "Overhauling" is "searching out any hidden fire." In the course of this activity he found three or four cans which had exploded and showed signs of having ruptured. He also found additional machine gun parts in the burned areas of the living-dining area. The bedroom was scorched but not burned. A photograph showing a container

of cylindrical tubes, a photograph showing a hand holding a cylindrical tube, and a photograph of a box containing a plastic material and cylindrical tubes were similar to items the fireman saw in the apartment.

About 9 a.m. a policeman arrived at the scene in response to a radio call. He entered and was directed to the bedroom. There was nothing in the other rooms. There was no smoke in the apartment. The front portion of the apartment was burned and blackened. In the bedroom he saw a large quantity of ammunition and firearms. He saw a large box of miscellaneous gun parts in the closet. He saw more weapons in the cupboards of the kitchen area. He found an automatic pistol equipped with the silencer in a large brown bag in one of the cupboards. Another officer of the "bomb squad" came to his assistance. Together they went to a "rear garage locker," unlocked it with a key, and found fourteen cans of 8 mm rifle shells. The locker was attached to the building and "I.D.'d as the defendant's." The photographs show these items. He prepared a written list of articles removed. Policemen took the ammunition and explosives in a "bomb truck" to the Griffith Park and the gun parts to the police station in Van Nuys, "after they were satisfied that there weren't any other items in the apartment."

The fireman and policeman identified the assembled machine guns as the evidence which they had observed in parts in the apartment. A police officer, an expert in firearms and explosives, testified that he constructed four machine guns from the miscellaneous parts seized in less than an hour and identified exhibits 2 through 5 as the finished products. He expressed the opinion that the material found in the closet was a form of dynamite, that the fuse was a black powder fuse, that the attachment on the pistol was a silencer, and that the machine guns were capable of shooting multiple bullets with one pull of the trigger.

The position of petitioner is that the only emergency was the fire, that the emergency created by the fire had ceased when the police arrived, and that it follows that the entry of the police was not for the purpose of rendering aid or putting out the fire but solely for the purpose of searching the apartment and seizing the dynamite and gun parts.

The position of the People is that the emergency nature of the fire plus the explosive nature of the items found within the apartment not only required a thorough search of the

718

apartment by firemen but also by the police department "bomb squad"; that the safety of the other occupants of the apartment building and the law (Health & Saf. Code, § 12351) demanded the removal of the explosives from the building to a safe place; that the machine guns and silencer, having been observed in the course of a reasonable search and being contraband, were subject to seizure by the police without the procurement of a search warrant.

Petitioner's contention makes no attempt to distinguish the seizure of the explosives from the seizure of gun parts or silencer or to discuss the validity of the actions which brought them to light. There is no conflict in the evidence and it seems an obvious fact that the dynamite, large quantities of ammunition, and most of the gun parts were found in the closet by the fireman in the course of a search for possible victims at the earliest moment possible, an obviously reasonable search justified by the exigent circumstances. Is it the seizure which petitioner contends was unreasonable? Or, the fact that the seizure was by a policeman rather than a fireman?

■ The main question presented is whether the police were justified in making the search they did, particularly of the cupboard in the kitchen.

■ "The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." (*Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 932, 88 S.Ct. 1889].) ■ Whatever the materiality, petitioner sets forth the testimony of the fireman to the effect that he left the dynamite in the closet because it was not a hazard and relies on this evidence as proof that there was no emergency thereafter. Petitioner fails to include the additional testimony of the fireman that the bulk of the fire had been "knocked down" at that point and he "did not feel that it was going to extend any further." Petitioner also omits the evidence that the fireman notified the chief and the chief, observing the contents of the closet, immediately ordered assistance. This fact raises a conflicting inference that it was the superior's opinion that the presence of the explosives created an extremely hazardous condition.

A further question in resolving the facts is raised by the fact that the record contains no explanation of the function of the "bomb squad" other than that the term itself implies that the members of the bomb squad are specialists in the emergency handling of bombs, explosives, etc. which are

inherently explosive in nature. May this inference be drawn? We think it can and should be. There is also testimony by the policeman that when he arrived at the location he started "his investigation" and that he "had everything the fire department had." There is no direct testimony reflecting the fireman's purpose in calling for police assistance or for the bomb squad. There is no direct testimony that the police officer's purpose was to secure or seize explosives. There is, in fact, only inference from his testimony that "another" officer on the bomb squad joined him to support a finding that he was actually a member of the bomb squad. There is just enough evidence to find from the record that the function of the bomb squad at fires of explosive origin or where explosives are found to be present is to secure and seize all items of an explosive nature, that the work requires one with special training, that the policeman's routine assignment was on the bomb squad, and that there was inherent in the presence of explosives extreme danger which demanded that he as a member of the bomb squad and no other remove the explosives and make a thorough inspection for other explosives. Would the facts available to the police officer at the moment of entry and during the subsequent searches by him warrant a reasonable man in his position and knowing what he knew in the belief that his actions were necessary at that moment? (*Terry* v. *Ohio*, 392 U.S. 1 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868].)

We so hold. The explosions took place in one of eight apartment units. The explosions were of sufficient strength to blow out a kitchen window, shake a common wall and start a fire. It was certainly reasonable under the circumstances to search the cupboard for possible explosives which might set off further explosions and-or fires. This for the protection of the inhabitants of the 8-unit building and also the nearby property owners who would be endangered by a conflagration.

It seems only fair to comment that the police officer's statements and conduct may also warrant the inference that his duties were those of an arson investigator. In *State* v. *Cohn* (Mo. 1961) 347 S.W.2d 691, cited by the People, a defendant charged with arson sought to suppress photographs made on the day of the fire during a three-hour period in which firemen and police officers stayed on the scene of a fire after it had been extinguished checking the cause of the fire and taking pictures. The court noted that firemen enter under a license given by law for the benefit of the public generally and their right to enter is independent of any permission of

the possessor of the property, who has no right to exclude them; that being lawfully in the building "it was the duty of police and firemen to protect the public by investigating to see that the fire would not start again and therefore to determine its cause, to check such conditions as gas and electrical installations, to safeguard inflammable materials, and to discover any dangerous conditions. A search for such purposes was lawful and proper and the information discovered in making it was lawfully obtained." The opinion distinguishes cases where at some later time government agents enter the premises seeking to find incriminating evidence. The instant case would in respect to this view fit with the cited case, which draws no distinction between firemen and policemen, but assumes both classes are at the scene for a unified purpose.

In *State* v. *Rees* (1966) 258 Iowa 813 [139 N.W.2d 406] immediately after a fire had been put out, the fire chief and his associates a city electrical inspector, a state fire marshal, an agent of the board of fire underwriters, and a foreman of the light and power company entered the premises for the purpose of "investigation" and reentered subsequently over a period of weeks, without a warrant. The grand jury returned an indictment for arson based in part upon evidence obtained in the investigation. Relying on *Frank* v. *Maryland,* 359 U.S. 360 [3 L.Ed.2d 877, 79 S.Ct. 804], as authorizing civil inspections without a warrant, since overruled in that respect by *Camara* v. *Municipal Court,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], and *See* v. *Seattle,* 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737], five members of a divided court held that the entry and search for evidence was valid without a warrant where a statute provided for such investigation of a fire and the regulation was reasonable. Four dissenting justices considered the record inadequate to determine whether the conduct of the state agents on the premises was reasonable.

In *State* v. *Buxton* (1958) 238 Ind. 93 [148 N.E.2d 547] a fire marshal and deputies entered the burned out premises of a restaurant some days after the fire on two occasions through an unlocked door. They found incriminating evidence on the second visit. The state relied on an inspection statute. The court found that under the facts the inspection was a search for incriminating evidence and not a civil inspection authorized by the statute and, in any event, the statute would be interpreted to incorporate constitutional safeguards. The holding is limited to the rule that a search warrant is required by the fire marshal and his deputies in criminal inves-

tigations regarding the cause of fires *when not made at the time of the fire.*

In our case we have an additional fact, the presence of explosives. The awesome destructive power of explosives has inspired broad regulation of the field by statute, administrative order, and local government ordinance. For example, part I of division 11 of the Health and Safety Code contains nine chapters devoted to the regulation and control of "any substance, or combination of substances that is commonly used for the purpose of detonation and which, upon exposure to any external force or condition, is capable of a relatively instantaneous release of gas and heat." (Health & Saf. Code, §§ 12000 et seq.) The legislation is directed at the complete control including possession, use, sale, transportation, storage and disposition of explosives of the type mentioned. Any person found with an explosive, as thus defined, on his person or in his possession in numerous specified places including a private habitation is presumed guilty of reckless and malicious possession. (Health & Saf. Code, § 12304.) This presumption has been upheld. (*People* v. *Fitzgerald,* 14 Cal. App.2d 180 [58 P.2d 718], cert. den. 299 U.S. 503 [81 L.Ed. 437, 57 S.Ct. 115].)

Any explosive possessed, other than in the course of certain limited activities not pertinent here "shall be subject to immediate seizure by any chief or police official" (Health & Saf. Code, § 12351). "Chief" includes the chief of any city fire department and his authorized representatives (Health & Saf. Code, § 12003). In his own jurisdiction the chief "shall" enforce the provisions of part 1 and the California Highway Patrol, local police department and sheriff's department "may" enforce them (Health & Saf. Code, § 12020).

This is not to imply that because there is a statute authorizing both the fireman and police officer to seize such explosives that for that reason they may enter without a warrant. (See *Camara* v. *Municipal Court, supra,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] and *See* v. *Seattle,* 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737].) ■ "The question . . . upon review of a state-approved search or seizure 'is not whether the search [or seizure] was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. . . .' " (*Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 934, 88 S.Ct. 1889].)

Members of an organized fire department have the powers

of peace officers while engaged in the performance of their duties with respect to the prevention and suppression of fires and the protection and preservation of life and property against the hazards of fire and conflagration. (Health & Saf. Code, § 13875.)

■ Where a police officer who makes a lawful entry observes in plain sight some contraband the seizure of the contraband is not unreasonable. It is his duty to seize it. To require him to obtain a warrant furthers no recognizable interest. (*People* v. *Kampmann,* 258 Cal.App.2d 529 [65 Cal.Rptr. 798].) ■ It would follow that where a fireman with the powers of a peace officer seizes contraband in plain sight, the seizure is not unreasonable.

■ We think that what this record shows is that the firemen, acting as peace officers, called the policeman to assist them in taking physical possession of the explosives, weapon parts, and ammunition; that the powers of the firemen were those of both firemen and policemen; that as firemen they were entitled to search the cupboard in the premises in the performance of their duties, and the seizure of the gun with silencer under that premise was justified as discovered within the scope of the purpose of their entry.

The motion to suppress the evidence obtained under Penal Code, section 1538.5, was properly denied.

The alternative writ is discharged and a peremptory writ is denied.

Files, P. J., and Jefferson, J., concurred.