Herbert F. **STEIGLER**, Petitioner,

v.

Raymond W. **ANDERSON**, Warden, Delaware Correctional Institution, Respondent.

No. 173.

United States District Court, D. Delaware.

June 6, 1973.

William E. Taylor, Jr., Wilmington, Del., for petitioner.

Richard R. Wier, Jr., Delaware State Prosecutor, Wilmington, Del., for respondent.

## OPINION

LAYTON, District Judge.

Petition for Habeas Corpus. Denied.

During the early morning hours of October 19, 1968, the home of the petitioner in Deerhurst, New Castle County, Delaware, caught fire, firemen were summoned by petitioner's wife and the blaze not extinguished before three members of the family, petitioner's daughter, his mother-in-law and father-in-law had burned to death. During the fire, containers filled with gasoline, rugs saturated with gasoline, burnt matches and the like were found in the house. Since the fire was clearly set by an arsonist, the police were called in and the investigation lasted for some days thereafter resulting in interrogations of petitioner by Sergeant Bramble of the State Police on three occasions without his being given Miranda warnings.

Eventually, petitioner was indicted and convicted by a jury in the Superior Court of Delaware on three counts of murder in the first degree and one count of assault with intent to commit murder. On appeal, the Delaware Supreme Court affirmed the conviction, Steigler v. State, 277 A.2d 662 (Del.Supreme Ct. 1971). On the same day as its landmark decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court in a brief order granted certiorari, vacated the sentence of death im-

posed on the murder convictions and remanded the case. 408 U.S. 933, 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972). This petition for a writ of habeas corpus followed.

Three grounds are specified: [1] one, that certain statements taken by the police of this petitioner were improperly admitted into evidence in violation of petitioner's constitutional rights because no *Miranda* warnings were given; the second, because certain physical evidence (the containers filled with gasoline, etc.) found in the home at the time of the fire were improperly admitted into evidence in further violation of petitioner's constitutional rights because no search warrant had issued; and the third, that petitioner's conviction was based, at least in part, upon perjured police testimony.

My examination of the record indicates that the findings of the Delaware Supreme Court related at pages 663–666 of 277 A.2d, insofar as they pertain to the points here raised, are fully sustained by the evidence.

### FAILURE TO GIVE MIRANDA WARNINGS

■ The first statement was made by petitioner to Sergeant Bramble of the Delaware State Police at the home of petitioner's neighbors where they had taken refuge at 6:30 A.M., on the same morning as the fire. Apparently, Bramble and the petitioner alone were present. There was obviously no coercion for not only did the petitioner talk freely [2] but, within minutes after this interview with Bramble, he voluntarily repeated to a newspaper reporter the essence of what he had just told Bramble. During this interview, petitioner was neither under arrest, in custody, in any way deprived of his freedom nor was the investigation in any way "focused" on him because, other than the strong suspicion the fire was arson, police had no substantial evidence that petitioner was or might have been the perpetrator.

■ The second statement taken by Bramble was the next day, October 20, when Bramble asked petitioner by telephone if he and members of his family would come over to the police station and have their fingerprints taken. This was because, as Bramble stated to petitioner, if the containers of gasoline found in petitioner's house had actually come from petitioner's home, then the fingerprints of the family, or some of them, would undoubtedly appear on the containers. All members of the family drove to the police station for the fingerprinting and, thereafter, Bramble again interviewed petitioner. He showed the various containers to petitioner and as to some, petitioner thought they had been in the home prior to the fire and, as to others, was uncertain. Bramble also asked petitioner if he knew of any persons he suspected might have been the perpetrator of this crime and petitioner furnished Bramble with two names. By arrangement, the petitioner and his family then drove home followed by Bramble and another officer. They all descended to the cellar where both petitioner and his wife, under circumstances demonstrating not only voluntariness but a willingness to assist actively in the investigation, answered questions and pointed out shelves in the cellar where some of the containers had

---

1. Originally, there were 11 grounds of error assigned. However, by letter dated May 21, 1973, petitioner's counsel stated to the Court that after careful consideration and a lengthy conference with his client, all grounds but those above mentioned were abandoned.

2. He said he was awakened late at night by a noise downstairs and thought he had left the television set on. He descended the stairs and as he neared the bottom step, there was a sharp click or jolt and a flash fire. He first rescued his son, and hearing his wife scream from an upstairs window, found a ladder and managed to save her. One daughter was away visiting but his youngest daughter, mother-in-law and father-in-law died. Petitioner never confessed but took the position that an unknown person set the fire.

been resting. Again, while during the first part of the interrogation petitioner was alone with Bramble in the police station (his wife and children were also obviously somewhere nearby in the police station), there was no arrest or taking of petitioner into custody or any of the circumstances laid down in Miranda v. Arizona.

In the third interview, October 23, Bramble asked petitioner if he would again come over to the police station at Troop 1 for a further interrogation. At this time, petitioner again voluntarily drove to the police station and was questioned by Bramble alone. First, he was asked more about one of the suspects whom he had named on the 20th as a possible perpetrator of the crime; then about windows being open and a cellar door unlocked. Again, he repeated his actions the morning of the fire and gave information as to policies of insurance held by him and his family, his in-laws and the possible net worth of his in-laws, as well as the fact that the night of October 19th was to be the last night of his in-laws' visit. As of the opening of this interrogation, this petitioner was in no sense in custody, deprived of his freedom and, because of the meager facts then in the hands of the police, it could not be argued with any persuasiveness that the investigation had focused on him. Moreover, as in the two preceding interrogations, he was permitted to return home without any restraint on his movements.

On the next day, October 24, Bramble talked briefly with petitioner about a list of additional suspects which Bramble had asked him to prepare on the 23rd. Sometime around noon, Bramble dropped by petitioner's office to pick up this list but petitioner stated he had not finished it. At about 5:00 P.M., petitioner personally delivered the list to Bramble who looked it over and observed that one person named in it was dead. Petitioner then remembered one additional name which he furnished Bramble. I do not regard any conversations between Bramble and petitioner on October 24th even as interrogations, let alone requiring Miranda warnings.

It was not until 5 or 6 days later, on October 29, after all the subjects named by petitioner had been interviewed, the materials returned from Washington together with the reports of the F.B.I. concerning its examination of the physical evidence (jars, containers, pieces of rug, matches) and a number of other persons had been interviewed that the police actually charged petitioner. For instance, even subsequent to the third interrogation, the police were in the process of questioning some 80 gasoline station operators to ascertain whether suspicious persons had bought gasoline in containers the night prior to the fire. Also, the information that an unidentified person, probably a boy, had been seen carrying a gasoline can through the neighborhood the evening before the fire had to be investigated and evaluated.

The actual facts of this case differ substantially from Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)[3] and its three companion cases, Vignera v. New York (see Miranda at 493–494, 86 S.Ct. 1602); Westover v. United States (see Miranda at 494–497, 86 S.Ct. 1602) and California v. Stewart (see Miranda at 497, 86 S.Ct. 1602 et seq.). The facts also differ widely from Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1968). In Miranda, Vignera, Westover and Stewart, the interrogations were

---

3. Miranda, for the first time, defined the stage of a police investigation at which a suspect should be given so-called "Miranda" warnings as "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." P. 444, 86 S.Ct. p. 1612. At this point, a footnote was added in this language: "This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused." Miranda, supra at 444, 86 S.Ct. at 1612. This vague language, further muddied by the footnote, has been the source of judicial interpretation ever since.

clearly "in custody", led to eventual confessions and, even prior to the interrogations, there was direct evidence pointing to petitioner's guilt. In *Orozco*, the defendant was questioned in his bedroom at 4:00 A.M. by four policemen under circumstances demonstrating a clear deprivation of freedom and with prior direct evidence linking him to the crime.

In the present case, there was no direct evidence pointing to petitioner prior to the interviews. Indeed, the only evidence ever obtained was circumstantial and it was not until all other alternatives were unsuccessfully explored that petitioner was finally charged. This did not occur until six days after the last interrogation. Moreover, throughout the whole investigative process, petitioner was apparently cooperating with the police. There was not the slightest suggestion of "in custody" atmosphere surrounding the giving of the first statement. While the second statement in part was at a police station, petitioner drove there voluntarily with his whole family, and the second part of the interview was in his own cellar in the presence of his wife, where both were actively assisting the police. As far as the record shows, when the police left the petitioner's home after examining the cellar, the petitioner was left free insofar as his future movements were concerned.

It may be argued that the third interview most nearly approaches a *Miranda* situation. It was at a police station where petitioner was alone with the police officer in charge of the investigation. But again, petitioner drove to the station voluntarily and was free to leave afterwards.

Even at the time of this third interrogation, however, it could hardly be said that there was probable cause to believe petitioner was a prime suspect because many suspects had still to be interviewed and the physical evidence and conclusions of the F.B.I. had not been received back from Washington. And in this same connection, it is significant that as late as October 22nd, the day prior to the last interrogation, the police had a representative at the funeral of the deceased members of the family for the purpose of protecting the remaining members from possible violence from some unknown, perhaps psychotic, person determined to eliminate the entire family. Throughout, the chief investigating officer, Sergeant Bramble, never considered petitioner a prime suspect until five days subsequent to the last interrogation of petitioner.

It should be mentioned in passing that a great deal of testimony bore on a letter written by the State Police to the F.B.I. when the containers were sent there for examination. In this letter, petitioner was referred to as "our suspect." However, it is clear that this letter was dictated not by the chief investigator, Bramble, but by his superior, Lieutenant Mitchell, who knew little about the case. I agree with the Delaware Supreme Court's conclusion that little or no weight can be attached to this circumstance.

The three described conversations with the police were more in the nature of interviews than interrogations. As stated above, they were not accusatory in nature or unduly prolonged, there was no suggestion of hostility or pressure, no arrest or "in custody" atmosphere and, unlike the cases above referred to, no confession elicited. It may be mentioned parenthetically also that petitioner was an intelligent man and a college graduate, not an ignorant type of character capable of being easily intimidated.

In comparing a number of tests suggested by the authorities bearing on this point, it would appear that interrogations at a police station have been accorded substantial weight in evaluating the existence of a *Miranda* type situation. See 31 A.L.R., 3rd Series, Cus-

todial Investigation, 565 at 577 et seq.[4] However, in all other respects, the conduct of these particular interrogations reflect an opposite conclusion:

(1) There was a complete absence of restraint of petitioner's liberty; for instance, on October 24th, Bramble spoke with him briefly at his (petitioner's) office;

(2) The interrogations were routine and courteous in character;

(3) There is no evidence that the investigation had "focused" on petitioner. The evidence that police were quietly "shadowing" the petitioner's family against the possibility of harm at the funeral is significant in that respect. Moreover, other suspects and persons were being interviewed and the physical evidence had not been returned by the F.B.I. Thus, the progress of the investigation was not in any final stage;

(4) Petitioner was a young and intelligent man, a college graduate and not to be easily cowed or intimidated by police presence;

(5) The times of the interrogations seemed to be reasonable, subject to petitioner's convenience and not unduly prolonged.

With reference to subheading (3), *supra*, something more should be said. An important consideration in determining the existence of "custodial interrogation" is whether or not the investigation was then "focused" on the suspect.[5]

Certainly, it could not be persuasively argued that petitioner should have been warned before the first interview on the morning of the fire. This interrogation was clearly part of the general investigative process and turned up no information pointing to petitioner as more than a possible suspect. At the second interrogation, next day, the police had no further information except that both a downstairs and basement window were found partially open at the time of the fire and also that the cellar area way door was unlocked and open. At this second interview, the police discovered only the additional facts that all the containers had been in petitioner's cellar and that a rubber glove, not belonging to the house, was found in the cellar.[6] At the beginning of the third and last interrogation, then, police knew (a) that arson had been committed (b) that the arsonist had used containers which had been in petitioner's cellar (c) that partially opened windows and an open cellar door suggested, at least the possibility, that an outsider could have set the fire (d) that the containers and other evidence were then in the possession of the F.B.I. and, for all the police knew, might reveal additional facts about known fingerprints or fingerprints of some other person, or evidence pointing to a source other than petitioner, and (4) that petitioner, as far as the police knew, was a young, respected member of the community, a college graduate, a regular churchgoer and not a person to whom suspicion of such a horrible crime would lightly attach.

---

4. However, the Courts have repeatedly stated that an interrogation of a suspect at a police station is not necessarily a decisive factor in determining the existence of a *Miranda* type situation. As said by Judge Burger for the District of Columbia Court of Appeals in Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158, 162 (1968);
"Questioning of a witness cannot be characterized as 'custodial interrogation' simply because it occurs at a police establishment."
See also Fisher v. Scafati, 314 F.Supp. 929, 936 (D.C.Mass.1970) aff'd 439 F.2d

307 (1st Cir. 1971). The Circuit Court noted in passing that the routine interrogation of defendant at the police station on July 9th was a non-custodial interview. 439 F.2d 309–310.

5. " * * * the one thing that is undeniable is that the opinion (*Miranda*) said that focus means custody not that custody means focus." United States v. Hall, 421 F.2d 540, 543 (2d Cir. 1969).

6. However, the glove was in no way associated with petitioner.

In my judgment, it could hardly be said that as of the morning of October 23rd, the investigation had "focused" on petitioner. True, as part of that last interview, the existence of insurance policies, the net worth of petitioner's in-laws and the fact this was the last night of their visit indicated for the first time the existence of a possible motive but these facts were revealed only *during*, not *before*, that interview, whereas both simple justice and common sense require that whether *Miranda* warnings should be given should not be judged from hindsight.

In one of the leading cases on this subject, the 2nd Circuit Court of Appeals said this:

" * * * On the other hand, a standard hinging on the inner intentions of the police would fail to recognize *Miranda's* concern with the coercive effect of the 'atmosphere' from the point of view of the person being questioned.

"The test must thus be an objective one. Clearly the Court meant that *something* more than official interrogation must be shown. It is hard to suppose that suspicion alone was thought to constitute that something; almost all official interrogation of persons who later become criminal defendants stems from that very source. While the Court's language in *Miranda* was imprecise, doubtless deliberately so, it conveys a flavor of some affirmative action by the authorities other than polite interrogation. This view is strengthened by the passage at 384 U.S. 478, 86 S.Ct. 1630, where the Chief Justice, after referring to 'the compelling atmosphere inherent in the process of in-custody interrogation' and just before a second and slightly altered affirmation of the test, inserted a footnote reading:

[46] The distinction and its significance has been aptly described in the opinion of a Scottish court:

'In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice [of interrogation at the police station] may be, it must normally create a situation very unfavorable to the suspect.' Chalmers v. H. M. Advocate [1954], Sess.Cas. 66, 78 (J.C.).

"Even without the light of Orozco we would not have thought this to mean that questioning in the home could never come within the mandate of *Miranda; we do think it suggests that in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.* This is not to say that the amount of information possessed by the police, and the consequent acuity of their 'focus,' is irrelevant. The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda,* and *vice versa.* But this is simply one circumstance, to be weighed with all the others. * * *." (Emphasis added.) United States v. Hall, 421 F.2d 540, 544–545 (1969).

Compared with the facts of the cases already reviewed and a number of others such as State v. Mitchell, 282 Minn. 113, 163 N.W.2d 310 (1968), the case at bar, in my judgment, falls short of presenting a *"Miranda"* warning situation. True, there were three interrogations but, on the other hand, this is an unusual case. Unlike other cases mentioned, the petitioner here, as owner of the house and both awake and nearby when the fire started, while a suspect, was also the only important source of information about this fire. No eyewitness linked him to the crime and since he was

apparently cooperating voluntarily in its solution, it was only natural that the police felt free to question him on several occasions during the course of what, to me, appeared to be the normal investigative process free of the hostile and accusatory atmosphere often present during the investigation of a prime suspect.[7]

It is my conclusion that the manner in which the police conducted the three interrogations which took place in this case fell substantially short of demonstrating that petitioner was either in custody or being significantly deprived of his liberty; Hicks, 382 F.2d at p. 161; or, although a suspect, that he was other than one of a number of suspects who, because of his proximity to the events surrounding the fire, was being interviewed or interrogated in the course of a thorough investigation in order to discover clues as to the nature and origins of this fire.

## EVIDENCE SEIZED WITHOUT A SEARCH WARRANT

█ Petitioner's second contention that the physical evidence found in his home (containers filled with gasoline, etc.) were improperly admitted into evidence in violation of petitioner's 4th amendment rights because seized without a warrant is untenable.

The answer to this question depends upon a correct analysis of the facts. Here we have a fire company summoned to a fire by petitioner's wife. Fortui-

tously, a fire marshal was at the firehouse at the time and accompanied the first truck. On arrival, it was learned that some of the inhabitants were still trapped on the second floor. It should be noted that the Fire Marshal, Lynch, had certain investigatory powers set forth in T. 16, Del.C. § 6607(f) and (g).[8] They entered the burning house not only to extinguish the fire but more importantly to rescue occupants trapped on the second floor. Upon entry they began to discover physical objects obviously pointing to arson. The house was still burning. Firemen and other persons not authorized to be inside were milling about. The physical evidence above enumerated was not only in plain view but, under the circumstances then existing, some of it being of a highly volatile nature, might have caught on fire or the contents of the containers overturned, and, thus, valuable evidence of a crime destroyed. Also, the fire rendered the house uninhabitable. Clearly, then, it became necessary to segregate and catalogue this material in order to preserve it as evidence.[9]

Under such facts, for petitioner to argue that this physical evidence was improperly admitted in violation of petitioner's 4th amendment rights is plainly incorrect. Petitioner has misconceived the theory under which these containers, saturated rugs, matches and the like were admitted into evidence. This is not, as he contends, the normal search

---

7. *Miranda* warnings contain an inference of accusation of guilt. Several cases have suggested the need for caution on the part of the police in giving these warnings at too early a stage to persons who are superficially innocent, and particularly who are respected members of the community, until enough evidence is developed to render them prime suspects. See State v. Mitchell, *supra*, at pp. 315–316, and United States v. Hicks, *supra*, 382 F.2d at p. 161.

8. "(f) The * * * Deputy, or Deputies, may at any time investigate as to the origin or circumstances of any fire * * * occurring in the State, and may at all reasonable hours enter any build-

ing * * * within his jurisdiction for the purpose of making an inspection or investigation, which, under the provisions of this chapter, he may deem necessary to be made."

"(g) The State Fire Marshal, or his Deputy, or Deputies, shall have the authority to issue subpoenas in the enforcement of this chapter."

9. The fact is that the fire broke out again later in one portion of the house, well after it was thought to have been extinguished or "secured," demonstrating how easily some or all of this highly relevant evidence might have been destroyed had it been left for some considerable time pending the obtaining of a warrant.

and seizure situation requiring the issuance of a warrant based upon probable cause as a condition precedent to the seizure of evidence. To the contrary, it is a case where firemen summoned to a fire by the owner's wife, and thus by invitation, in a clear case of emergency, entered the home and, incidentally, noticed physical evidence in plain view clearly pointing to arson. In United States v. Barone, 330 F.2d 543 (2nd Cir. 1964), a policeman heard screams in the nighttime and upon entering the premises found incriminating evidence. The Court said:

> "The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law. See generally Read v. Case, 4 Conn. 166 (1822). Indeed, it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly."

See also Root v. Gauper, 438 F.2d 361 (8th Cir. 1971); Wayne v. United States, 115 U.S.App.D.C. 234, 318 F.2d 205, 212 (1963); State v. Cohn, 347 S. W. 691, 694–695 (Sup.Ct.Mo.); Romero v. Superior Court for County of Los Angeles, 266 Cal.App.2d 714, 72 Cal.Rptr. 430, 433 (1968). The same principle is applicable to firemen.

> "There never has been any doubt that a policeman or fireman is privileged to enter private premises in the discharge of his public duty." State v. Sutton, 454 S.W.2d 481 at 494 (Mo.).

In this connection also see Romero, supra.[10]

Furthermore, petitioner's argument that under these same circumstances the Fire Marshal was not justified in seizing these physical objects is equally misplaced. This was not an entry pursuant to a routine investigation by a Public Health Inspector or Fire Marshal as in Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), but an emergency entry into a blazing home to extinguish the fire and rescue persons known to be trapped on the second floor. This type of entry is specifically excepted from the holding in Camera.[11]

To recapitulate then, we have here a clear and compelling emergency justifying a legal entry, Barone; the equally valid seizure of evidence of a crime lying about in plain view, United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1926); Petteway v. United States, 261 F.2d 53 (4th Cir. 1958); and the introduction into evidence of photographs of bits of evidence clearly admissible as depicting more accurately what the witnesses actually described from their own observation. McCormick, Evidence, 387–388 (1st Ed. 1954).[12]

The record as to the exact times of arrival of various witnesses at this fire, including some of the firemen and the police, and the exact nature and duration of their efforts, is necessarily somewhat confused.[13] That the fire was originated by an arsonist was reasonably clear from the very beginning. Three persons were burned to death. In a dis-

---

10. "Where a police officer who makes a lawful entry observes in plain sight some contraband, the seizure of the contraband is not unreasonable. It is his duty to seize it. To require him to obtain a warrant furthers no recognizable interest. [Citation] It would follow that when a fireman with the powers of a peace officer seizes the contraband in plain sight, the seizure is not unreasonable."

11. "Since our holding emphasizes the controlling standard of reasonableness, noth- ing we say today is intended to foreclose prompt *inspections, even without a war- rant that the law has traditionally up- held in emergency situations.*" (Emphasis added.) *Camara,* at p. 539, 87 S.Ct. at p. 1736.

12. These photographs can hardly be regarded as raising matters at the constitutional level.

13. For instance, see Lynch RPPs 258–272 and Nicholls RPPs 135; 140–141.

aster of this sort, neither the firemen nor police were making written notes of their various activities or punching time clocks on their arrival. A fair reading of the evidence would indicate that although the firemen arrived on the scene at about 2:32 A.M., and the fire was under control within 15 minutes, much work remained before it was finally extinguished. This involved ventilation, minute examination for any remaining smouldering fires, and the cleaning up process. As elsewhere mentioned, at one point during the later stages of the clearing up process, the fire "rekindled" under the stairway and again had to be extinguished. Bramble arrived about 3:30 A.M. and it is reasonably certain that his superior, Lieutenant Bishop, together with the Fire Marshal were examining the interior of the house before Bramble arrived. A fireman, Nicholls, recalls that it might have been as late as 4:15 A.M. before the final clearing up process was complete, and the subsequent outbreak of the fire again under the stairway could well have occurred even after the arrival of some of the police. As above stated, the first policeman on the scene was Lieutenant Bishop who entered the house after the fire was "under control" but still not secured. Most, if not all, of the evidence objected to was pointed out to Bishop and Bramble by Lynch, no doubt, during the clearing up process and while the investigation of the house proceeded throughout the day of the fire, there is no record that anything significant was found other than those various pieces of evidence already noticed by the various firemen and Lynch while fighting the fire, removing the dead and the various duties connected with the clearing up process.[14]

In my view, not only the entry of the firemen, but the subsequent entry by the police before the fire was finally secured, was justified under the rationale of the emergency doctrine above discussed. See also in this connection, United States v. Rubin, et al., 3rd Cir. 1972, 474 F.2d 262, and Patrick v. State, 227 A.2d 486 (Sup.Ct.Del.1967).

■ There is a third point which must be treated briefly. Petitioner argues that his conviction, in part at least, was based on perjured police testimony and that his constitutional rights under the 14th amendment were violated. He cites as one of his principal authorities Curran v. State of Delaware, 154 F.Supp. 27 (D.Del.1957) aff'd 259 F.2d 707 (3rd Cir. 1958). There is a wide difference, however, between the two cases. The argument by petitioner is this: Bramble always maintained that petitioner was not a prime suspect until the reports of the investigation by the F.B.I. of certain evidence were received on October 29th, on which date petitioner was arrested. Lieutenant Mitchell, his superior, however, when sending the various items of evidence to the F.B.I., wrote a covering letter dated October 21st in which petitioner was referred to as "our suspect." This has been mentioned earlier. Of couse, what Mitchell stated in the letter is relevant but regardless of what either Bramble or Mitchell thought about the status of petitioner as a suspect, it was for a court to determine from all the evidence whether petitioner at a given time was entitled to his *Miranda* warnings. Mitchell, in fact, knew little or nothing about the course of the investigation and stated at one point that his use of the term "our suspect" was an error, which in all probability it was. Instead, he attempted to explain away his use of the words by a not very convincing differentiation between the words "subject" and "suspect." But to try to argue from this that there was perjury rising to the point of a constitutional

---

14. Admittedly, Bramble and other police were engaged in cataloguing and boxing much of this evidence as late as the afternoon of October 19th but as above stated, there is no record of the finding of any evidence not already noticed. The house was apparently locked up and secured by the police about 7:00 P.M. of the evening after the fire.

level is wholly unpersuasive.[15] Mitchell could have been more candid, perhaps, but it can be argued that he was merely stating his own opinion supported by rather unconvincing arguments, all of which falls far short of the kind of straight, deliberate lie that was present in Curran v. State, *supra,* where, eight years after the trial, a police detective admitted he had committed perjury during the trial.

For the reasons stated, the petition for habeas corpus will be denied.

## ON MOTIONS FOR REARGUMENT

On June 7, 1973, this Court filed an opinion denying petitioner's petition for a writ of habeas corpus.

 Thereafter, petitioner filed two motions for reargument, the first complaining in effect that where, as here, the federal district court denied the petition for reasons different than those relied on by the Delaware Supreme Court, petitioner should first have had the opportunity to present his views as to the rationale relied on by the federal court. In theory there is some merit to this contention. However, not only would considerable delay be occasioned, but also, under the particular facts of this case, this Court can see no useful purpose to be served in a reargument and this phase of petitioner's motion is denied.

Secondly, petitioner complains that this Court in adopting the findings of the Delaware Supreme Court, pp. 663–667 of 277 A.2d has adopted that Court's theory of implied consent. This is clearly wrong [1] for a reading of this Court's recent opinion will demonstrate without doubt that it based its denial of the writ upon the theory of an initial, valid entry by public officers in performance of their duties in an emergency and the seizure of relevant evidence in clear view.

15. Suppose, for instance, Mitchell had stated from the stand that he regarded petitioner as a prime suspect on October 21st. A court would still have had to decide that he was, and that, together with all the other circumstances, including Bramble's contrary thought, petitioner was entitled to his *Miranda* warnings. Suppose again, that on the day Mitchell wrote this letter he had attempted to obtain an arrest warrant on the facts known at the time; i. e., that petitioner was awake and near the fire, that he was the owner of the house, that he was in his bare feet but not burned, that containers stored in his cellar and filled with gasoline were found in the house; *but also* that no one had seen him have anything to do with the containers or setting the fire; that

windows were open and a cellar door unlocked, giving rise to the possibility that an outsider could have done the job; that he was a respected member of the community to whom suspicion of such a horrible crime could scarcely attach; that there was no motive for his act and that reports from the F.B.I. not then received might reveal the presence of a stranger's fingerprints on the containers. The issuance of an arrest warrant under such facts would be subject to serious question.

1. What the Court intended to say was that it felt that it was in substantial agreement with the chronological recitation of facts as recited at pp. 665–667 of 277 A.2d.